**David J. WEINSTEIN, Plaintiff,**

v.

**AMERICAN BIOMATERIALS CORPORATION, and others, Defendants.**

No. 87 Civ. 8072 (IBW).

United States District Court, S.D. New York.

Dec. 22, 1988.

Rachell Roffe Sirota, Rabin & Sirota, New York City, for plaintiff.

Joseph M. Berl, Baker & Hostetler, Washington, D.C., for defendant Rose, Schmidt, Chapman, Duff & Halsey.

Allen S. Joslyn, Cahill Gordon & Reindel, New York City, for defendant Peat, Marwick, Main & Co.

E. Paul Kanefsky, Solin & Breindel, New York City, for defendant Greentree Securities Corp.

Daniel E. Kirsch, Kirsch, Gartenberg & Howard, Hackensack, N.J., for defendant Ernest J. Rich.

John D. Corse, Piper & Marbury, Baltimore, Md., for defendants W. King Smith, Wayne H. Parris and Willard P. Amoss.

Arthur S. Linker, Rosenman & Colin, New York City, for defendant Gilbert M. Barcus.

Mark Ellwood Bennett, Squadron, Ellenoff, Plesent & Lehrer, New York City, for defendant Joseph Nichols.

## OPINION AND ORDER

WYATT, District Judge.

This is a motion by plaintiff, said to be under Fed.R.Civ.P. 23(a) and (b)(3) and under Rule 4(c) of the Civil Rules of this Court, for "class action certification" (to quote from the notice of motion). The words quoted doubtless refer to the requirement in Fed.R.Civ.P. 23(c)(1) that the Court, after the commencement of a class action, shall determine as soon as practicable "whether it is to be so maintained." The motion is denied for the reason that the Court is unable to find that plaintiff, as the representative party, "will fairly and adequately protect the interests of the class" (Fed.R.Civ.P. 23(a)(4)).

This class action, commenced by plaintiff on November 12, 1987, is based on alleged violations of law (primarily federal law) through the filing by defendants of a Prospectus, a Registration Statement and other documents with the Securities and Exchange Commission (SEC). The documents so filed, beginning February 5, 1986, related to registered common stock and warrants sold through a public offering by defendant American Biomaterials Corporation (hereafter often "Ambio"; counsel refer to that corporation in their papers as "ABC"). The documents filed with the SEC are alleged by plaintiff to have been materially false and misleading because of a failure to disclose "a long-standing plan" by defendants MacKay and Russell, the two principal executives of Ambio, "to loot the corporate coffers for the benefit of" MacKay and Russell (e.g., para. 35(b); "para." references are to paragraphs of the complaint).

The class which the plaintiff seeks to represent is described as those persons "who purchased ABC [Ambio] Units, common stock, and ... warrants ..., during the period from February 5, 1986 ... to September 17, 1987 ..." (para. 25). There was a public offering on February 5, 1986, of Units of Ambio registered common stock and warrants. After that offering the registered common stock and registered warrants appear to have been separately traded in the over the counter (OTC) market. It is difficult to tell from the complaint whether the class is restricted to purchasers of "Units," or to purchasers of registered common stock *or* warrants *or* both. For purposes of this decision and opinion, it is assumed (as counsel for the parties appear to have assumed) that the class includes those who during the class period

purchased registered Ambio stock *or* warrants *or* both. The February 5, 1986, date is explained in the complaint as the beginning of the class period because it is the effective date of the Registration Statement and Prospectus for the public offering of registered Ambio stock and warrants (paras. 25, 8). The September 17, 1987, date is explained as the end of the class period because it is the date on which the stock and warrants of Ambio are alleged to have been "deleted" from trading through the National Association of Securities Dealers Automated Quotation (NASDAQ) system (para. 25). [The date on which Ambio stock and warrants were "deleted" from NASDAQ must have been July 13, 1987; the only reference found in the record (Ex. 4 for identification at Weinstein deposition) states this as the date when trading in Ambio "stock on NASDAQ was halted"; the Weinstein complaint appears to be mistaken as to the date on which Ambio stock and warrants were "deleted" from NASDAQ trading.]

Among many other reasons, there are two chief reasons why this Court cannot find that plaintiff will, as class representative, "fairly and adequately protect the interests of the class" (Fed.R.Civ.P. 23(a)(4)).

The first reason is that, beginning long before the class period (public offering by Ambio), plaintiff had many contacts with Ambio, MacKay, Russell and other defendants, obtained significant knowledge of their operations and had a number of transactions involving Ambio stock and warrants. Out of these experiences arise serious credibility problems. Plaintiff induced a group of seventeen friends and relatives (often called "my group" by plaintiff; in his deposition, for example, at T96, 153; "T" references are to pages of the stenographic transcript), to buy a part of a private placement in March, 1985, of *unregistered* shares and warrants of Ambio. For his services in inducing these purchases of unregistered Ambio stock plaintiff was personally paid $35,000 by Ambio; he and his group later signed a statement, dated November 26, 1985, that they believed they "were defrauded by Mr. McKay" (Joslyn Affidavit, Ex. C); plaintiff threatened a lawsuit against MacKay and Ambio, and by letter agreement, dated December 16, 1985, signed by members of the "group," a settlement was made (long before the action at bar was commenced) under which, for consideration to them, his group executed a general release to Ambio and its officers and directors.

The second reason is that other background circumstances and experiences create a substantial doubt that plaintiff could fairly and adequately protect the interests of the class.

1.

Some of the procedural history of this class action should first be noted.

The action was commenced by the filing of a complaint on November 12, 1987. The complaint, in compliance with Civil Rule 4(a) of this Court, bore next to its caption the designation: "Class Action Complaint"; also there were the words: "Plaintiff Demands Trial By Jury." The complaint was type signed by Rabin & Sirota as "Attorneys for Plaintiff" and manually signed by Edwin J. Mills, apparently a then member of the law firm of Rabin & Sirota. The complaint was not verified but it does not appear, nor is it suggested, that it is required to be verified. The complaint is *entirely* "upon information and belief, except as to those paragraphs herein which pertain to the named plaintiff ..." (statement at beginning of complaint). While this is in compliance with the rules, it means that plaintiff does not allege *any* personal knowledge of *any* of the essential averments in the complaint as to liability. This is surprising, to say the least, considering the many direct contacts plaintiff had, from some point in early 1985 to November 12, 1987, with the affairs of, and with the principal officers and directors of, Ambio. The basis of the "information and belief" on which the complaint is based is said (para. 5) to be "documents publicly issued or filed" by Ambio, "newspaper articles and press releases," and "reasonable inferences to be drawn therefrom in light of the study, investigation and analysis of plaintiff's *counsel* [presumably Mr. Mills,

signatory to the complaint]" (emphasis supplied).

The action, when the complaint was filed, was assigned in ordinary course to Judge Knapp.

According to information from the Clerk's office, Judge Knapp became a senior judge on November 23, 1987.

On January 13, 1988, counsel for plaintiff filed the motion which is the subject of this opinion. The motion (with notice) had been served by mail on January 11, 1988, and no suggestion is made by any defendant opposing the motion that it was not timely made under Civil Rule 4(c) of this Court. The opposing memorandum of defendants Peat Marwick ... etc. (an accounting firm; "Peat") and Rose Schmidt ... etc. (a law firm; "Rose") states: "Plaintiff moved for class certification on January 11, 1988."

On January 29, 1988, defendant Peat served by mail notice that on March 10, 1988, the deposition of plaintiff would be taken.

On February 8, 1988, the action was reassigned to Judge Walker. This must have been under Rule 17 of the "Rules for the Division of Business ..." of this Court which provides for the transfer of cases from a senior judge to an active judge.

By letter dated February 8, 1988, counsel for Peat wrote to all other counsel stating that Peat proposed to move to stay discovery on the merits pending the outcome of the motion by plaintiff for a class action determination and that a conference would be held with Judge Walker on that matter, as well as to fix a time for the class action determination motion to be heard.

On March 3, 1988, the action was reassigned from Judge Walker to me. This must have been under Rule 18 of the "Rules for the Division of Business ..." of this Court because Judge Walker had recused himself in this action. In consequence of the reassignment from Judge Walker, no conference was held with him as to a time for hearing the class action motion or the proposed motion for Peat to stay any discovery on the merits until determination of the class action motion.

On March 10, 1988, the deposition of plaintiff was taken by counsel for defendant Peat and was completed on that day. The transcript of the deposition extends to 170 pages. The plaintiff later signed an undated sheet noting typographical errors in the transcript.

Nothing was done by any party to bring on the class action motion of plaintiff for argument and decision.

On May 6, 1988, counsel for plaintiff served notice of a motion and a motion, returnable before me on May 17, for an order compelling discovery by defendants Peat, MacKay, Russell and Rich. The motion papers were filed on May 9. On May 6, by letter to me, counsel for plaintiff requested oral argument on the motion to compel discovery.

Under date of May 18, counsel for Peat wrote to me suggesting that if any argument were to be heard on any pending motion, it should be only on the motion for class action determination, because, were the class action motion denied, it would be "likely to end the action as a practical matter."

Under date of June 29, I sent a memorandum to all counsel. I fixed July 8 as the date for a pretrial conference and set the motion for class action certification for hearing at that time, on the ground that Fed.R.Civ.P. 23(c)(1) directed the Court to decide that motion "as soon as practicable."

The class action motion was heard on July 8; all papers were submitted a few days thereafter; and the matter was taken under advisement.

At the hearing on July 8, Ms. Rachell Sirota, a member of the firm representing plaintiff, appeared for plaintiff and explained that "Mr. Mills recently left the firm and I am filling in" (T3); she further stated that Mr. Mills had "handled this matter up until about three weeks ago" (T3). From this, it appears that Mr. Mills ceased to act for plaintiff about June 15, 1988.

2.

The claims made in the complaint here should next be generally examined.

There is one named plaintiff, David Joel Weinstein, and, while not set out in the complaint, from his deposition testimony it appears that he is 35 years old, a former clothing salesman, garment manufacturer, and stocktrader for his own account, who is presently "purchasing and reselling ... antiques" (T8).

There are two corporate defendants (one of which is described as a "firm" but has "Corp." in its name), two law firm defendants, one accounting firm defendant, and ten individual defendants (all of whom were directors or officers or both of Ambio).

The jurisdiction of this Court is based (para. 1) entirely on the existence of a federal question (28 U.S.C. § 1331) and on pendent jurisdiction. The federal laws cited (para. 1) are sections of the 1933 Act (15 U.S.C. § 77v) and of the 1934 Act (15 U.S.C. § 78aa). The claimed jurisdictional basis appears to exist, and neither that jurisdictional basis nor venue is contested. It should be noted that *no* claim is made by plaintiff, in the complaint or otherwise, that diversity jurisdiction exists.

The complaint avers its claims in violation of the rules, primarily because it is not "a short and plain statement" (Fed.R.Civ.P. 8(a)(2)). It is long (34 pages in 81 paragraphs); it is repetitive; and it pleads evidence. The complaint, on the same alleged factual basis, attempts to state nine separate claims, each on a different legal theory and, using a "carpet roll-up" effect, repeats in each succeeding claim, all the prior averments (thus forcing on opposing counsel and on the Court the burden of deciding what (if any) averments in the earlier claims are relevant to the later claims, which include "common law fraud" and "negligent misrepresentation").

The first seven counts in the complaint are against some, but not all, of the named defendants. The last two counts, designated "common law fraud" and "negligent misrepresentation," are against all defendants.

From the many words in the complaint, as I understand those words, the plaintiff is complaining primarily against the taking by defendants MacKay and Russell of funds of Ambio for their own personal benefit and (as will appear) plaintiff has based his charges on those made by Ambio itself in a New Jersey action commenced by Ambio several months before plaintiff brought his action.

In paragraph 9 of the complaint, it is averred that "at the time the Prospectus became effective [February 5, 1986], and thereafter during the Class Period, MacKay, directly and indirectly, conspired to and did misappropriate enormous amounts of [Ambio] funds for his own personal use and benefit...." In paragraph 10 of the complaint, it is averred that "[a]t the time the Prospectus became effective [February 5, 1986]," defendant Russell was a director and officer of Ambio, and "like MacKay, conspired to and did effect the misappropriation of substantial sums of [Ambio's] monies for his own personal use and benefit...." MacKay and Russell are the only defendants who are alleged to have taken Ambio funds for their own use. The other defendants are said to be liable because they are each "a co-conspirator and aider and abettor" and "engaged in either all or part of the unlawful acts, plans, schemes, transactions and artifices to defraud as charged herein" (para. 23).

The key issue posed by the complaint is the claimed misconduct of MacKay and Russell, in respect of which documents filed by defendants with the SEC are claimed to have been materially false and misleading by reason of statements therein and by reason of omissions; the other defendants are not claimed to have taken Ambio funds for their own use—they are only claimed, by false and misleading statements and by omissions from the documents filed with the SEC, to have conspired and covered up the misdeeds of the two principal defendants.

### 3.

There is a separate part of the complaint headed "Class Action Allegations" (paras. 25–29 inclusive). In this part, plaintiff attempts to satisfy the requirements of Fed. R.Civ.P. 23(a), "Prerequisites to a Class Action." We need only consider subsection

(4) of Fed.R.Civ.P. 23(a), that "the representative parties will fairly and adequately protect the interests of the class."

The only averments in the complaint to support the fairness and adequacy of the representation of the class by plaintiff are in these conclusory words (para. 27): "Plaintiff has retained counsel who are competent and experienced in class and securities litigation and who intend to prosecute this action vigorously. The interests of the class will be fairly and adequately protected by plaintiff." These words are of little value in determining the present motion because they state no facts, but only conclusions of the pleader.

### 4.

The chronology of the relevant activities of plaintiff should next be examined; his own deposition testimony is a principal source. There are credibility problems indicated in this testimony and, as to events and their dating, the testimony on its face seems vague and confused.

Plaintiff was 35 years old on March 10, 1988. Apparently he finished high school and claimed "[o]ne year of college" at "C.W. Post" (T5). "C.W. Post" is, according to my information, one of the six campuses of Long Island University and is located at Greenvale, New York, on Long Island some 25 miles from Manhattan. After the year at college, plaintiff went to work at a men's clothing store in Manhasset and at a ladies sportswear maker in the garment district of Manhattan, at one in the day, at the other at night (T5–6). This continued for four to five years when the ladies sportswear maker closed. Plaintiff then opened his own garment firm (presumably in Manhattan) making "junior sportswear" (T6). After one and one-half years this business filed a Chapter 11 bankruptcy, then came out of bankruptcy, and within a year and a half was liquidated (T6). Plaintiff then was employed by JN Apparel in which he was a "principal" (T6), with two others. In 1983 ("Five years ago" (T7)), he left JN Apparel. For "approximately six months, [he did] nothing" (T8).

After doing nothing for about six months, plaintiff began, apparently in September, 1983, "investing some of [his] funds ... as a private investor" (T8). This continued "until about six months ago" (T8), or about October, 1987; since then he has been "pursuing the purchasing and reselling of antiques" (T8).

When plaintiff began investing his funds "as a private investor," or shortly thereafter, plaintiff became a customer of Haas Securities Corporation ("Haas"), located at 120 Broadway, in the Borough of Manhattan (T16, 17); Haas was a member of the New York Stock Exchange. For some reason unexplained, Haas had a relationship with L.F. Rothschild, Unterberg, Towbin, Inc., apparently another brokerage firm, which rendered statements of account to plaintiff with the cryptic notation: "business introduced by Haas." Plaintiff remained a customer of Haas until "October or November of 1987" (T133) when he transferred his accounts from Haas "because Haas closed" (T141: presumably due to the October 19, 1987, stock market collapse). The accounts of plaintiff were transferred from Haas to Herzog Heine Geduld, located at 26 Broadway, in the Borough of Manhattan (T133) and a New York Stock Exchange member.

While plaintiff was a customer of Haas, he was not, so far as the record shows, a long term investor but on the contrary was a day to day, in and out, trader of stocks. He was considered a "house account" (T17), was given a "very, very low commission structure" (T17), had a margin account and a cash account (T141), was provided with a desk at Haas and a "computer interface" (T140), and spent the "[n]ormal business hours" of the day at Haas. Plaintiff made his office at Haas.

Plaintiff testified (T16) that he first heard of Ambio "approximately the summer of 1985." In this, as with a number of dates and events, plaintiff seems to be mistaken. It appears from the Prospectus filed February 5, 1986, with the SEC that the private placement of Ambio shares, in which plaintiff arranged for the purchase by his group of shares having a purchase

price of some $350,000, took place in March 1985; plaintiff must, therefore, have heard of Ambio at (latest) the beginning of 1985.

Plaintiff heard of Ambio from William Hogland, who had been a "trader" at Haas (T16) and was then "involved with" Ambio (T16).

According to its Prospectus later filed with the SEC, Ambio was organized in Virginia in November 1981 and had its office in Plainsboro, New Jersey (near Princeton); it had an exclusive license from the University of Florida to make and market medical and dental implant products based on the University's research relating to bioactive glasses and ceramics; the products were intended for use, among others, in cases of hearing loss and of bone atrophy following tooth loss (Joslyn Affidavit, Ex. B, p. 9).

Plaintiff was introduced at Haas to Hogland, who showed plaintiff a "private placement memorandum" about Ambio stock (T16); plaintiff was given a copy of this memorandum at Haas (T18) by Hogland (T20). A copy of this memorandum has been supplied to the Court by counsel for Peat; it is dated March 13, 1985.

Plaintiff "read and studied" the private placement memorandum and formed a "personal opinion" that Ambio had "unbelievable potential, to go into greatness" (T20); he "became totally enamored with the prospect of the company [Ambio]" (T21). Plaintiff then spoke to a few people in dentistry as to some of the Ambio products, but made no other investigation (T22).

Plaintiff then "went down" with Hogland to visit Ambio, presumably to Plainsboro, New Jersey, which would be "down" from Manhattan; he was told that the process and the glass "was FDA [Federal Drug Administration] approved" and he felt that this was "all the validity" which was "necessary" (T22). This visit was in the "summer of 1985," according to plaintiff's deposition testimony (T23; seemingly mistaken, because the actual private placement was in March 1985, must have *followed* this visit and must have been after March 13, 1985). Plaintiff met and had discussions with MacKay and Russell; they told plaintiff "what … they were looking to do with the company" (T28), that they were going to "raise the private placement funds and then go public" (T28).

After the visit to Ambio, plaintiff over the next two weeks discussed the matter with his family and friends and made the decision to help raise funds for Ambio in the private placement of its stock (T28–29).

Plaintiff then talked to 30 to 50 relatives and friends about buying shares of Ambio and gave them copies of the private placement memorandum, meanwhile continuing to have discussions with MacKay and Hogland (T30–32). His friends and relatives were all interested in buying the private placement stock (T41).

Plaintiff provided his group with copies of the private placement memorandum (T30); presumably this was *after* March 13, 1985, the date of that memorandum. Plaintiff testified that "next" he "sat down" with MacKay to work out a deal for compensation to plaintiff (T41). MacKay offered to pay plaintiff "a 10 percent commission against all funds" raised by him [plaintiff] through private placement stock sales (T41). Plaintiff was not interested in *money* "compensation" but wished "to receive a *stock* compensation for [himself] if [he] did raise these funds" (T41; emphasis supplied). Plaintiff and MacKay then "came to an agreement that that was okay on both our parts" and plaintiff "then proceeded to solicit funds for American Biomaterials" (T41). Plaintiff was able to induce friends and relatives to buy in the private placement shares of Ambio at $3 per share to the amount of some $350,000 (T42); he identified them at his deposition by name from, and check marks on, a page of the Ambio Prospectus (T43–44). For this, he "received approximately $35,000" from Ambio and "was afforded the right to buy 35,000 … shares of [Ambio] stock at $1 [per share]" (T42).

According to the Ambio Prospectus (Joslyn Affidavit, Ex. B, pp. 61–62), the "private placement" of Ambio shares—when the relatives and friends of plaintiff bought their shares—took place "[i]n March 1985." The same Prospectus reports: "On June 11, 1985, David J. Weinstein exercised an

option granted to him by the Company for financial consulting services for the purchase of 35,000 shares of its Common Stock at $1.00 per share" (Joslyn Affidavit, Ex. B, p. 63).

It is clear from plaintiff's deposition that the payment to him of $35,000 was *not* for "financial consulting services" but was "compensation for [himself] if [he] did raise these funds" (T41) by inducing purchases of stock by his group under the "private placement memorandum" (T41). Plaintiff admitted that he never suggested "any ideas or strategy" to Ambio and that the "compensation" he received from Ambio "was *only* in relation to placing securities" (T110–11; emphasis supplied). The statement in the Prospectus that the compensation was for "financial consulting services" seems designed to cover-up the true facts, and it seems possible, if not probable, and necessary, that plaintiff was himself a participant in that cover-up.

The private placement of Ambio shares was in March 1985 (Joslyn Affidavit, Ex. B, p. 61). Weinstein arranged for the purchase at $3 per share of shares for a purchase price of some $350,000 by his group (T42). On June 11, 1985, according to the Ambio Prospectus, Weinstein exercised an option which had been "granted to him by the Company [Ambio] for financial consulting services" and bought 35,000 shares of Ambio stock for $1 per share (Joslyn Affidavit, Ex. B, p. 63). Plaintiff described the transaction at his deposition (T42, 43) in this way:

I was given—it was—they handed me a check and I handed them a check at the same time. They gave me an American Biomaterials check for approximately $35,000 for my compensation, I then immediately exercised my right and gave them my personal check for approximately $35,000 to purchase my shares of stock.

Q. At what price were the shares sold in the private placement?

A. They were at $3 a share.

Q. So for your efforts you received 35,000 shares which on the basis of price used in the private placement would have been worth $105,000?

A. Yes, sir.

Plaintiff testified at his deposition (T73–74) that when he originally purchased the 35,000 shares on June 11, 1985, by the exchange of checks with Ambio and the pretended option, he received a certificate for those shares. Presumably he still has that certificate but the record, so far as we have found, does not indicate where it is; the stock trading records produced by plaintiff do not show that any broker holds the certificate.

The inducing by plaintiff of his group to purchase Ambio stock for $350,000 and the method by which he acquired stock of Ambio worth $105,000 as compensation for such inducement raise serious questions. Plaintiff appears to have joined with MacKay and Russell in a simultaneous exchange of checks in order to conceal the delivery to him of 35,000 shares of Ambio as such compensation. The exchange of checks on June 11, 1985, appears to have been designed to mask the transaction as the exercise of an option "granted ... by the Company" to plaintiff to buy 35,000 shares of Ambio "for financial consulting services," as the Prospectus stated. What the Prospectus stated, however, does not appear to have been true, as plaintiff surely knew; he himself testified at his deposition (T41–43) that the payment was for inducing "his group" to buy private placement Ambio shares.

The deposition testimony of plaintiff was that his deal with MacKay for compensation was made *before* his group bought Ambio shares in March 1985 and was for "a stock compensation for myself" (T41), that he and MacKay "came to an agreement that that was okay on both our parts" (T41), that he *"then* proceeded to solicit funds for American Biomaterials" (T41), and that these funds were the "[a]pproximately $350,000" from his group for the Ambio private placement shares (T42). The testimony suggests, at least in my reading, that this was an *oral* agreement; plaintiff never mentioned a *written* option "granted ... by the Company for financial

consulting services" (Joslyn Affidavit, Ex. B, p. 63), as described in the Ambio Prospectus. But counsel for Peat have supplied a copy of a letter from MacKay, dated June 6, 1985, addressed to plaintiff ("Dear David"), stating, among other things: "I am hereby issuing to you options on American Biomaterials Corporation stock of 35,000 options exercisable at $1.00 per share, on or before August 1, 1985"; this letter was signed *not* by the Company but by MacKay. The option letter was dated *after*, not before, the purchase by plaintiff's group of private placement shares in March 1985. The letter stated that the option was for your "outstanding efforts in helping American Biomaterials Corporation in obtaining a[n] underwriter for the company [for the public issue not the private placement] and your ongoing efforts in these underwriting and financial matters...." There is no mention in the MacKay June 6 option letter of the placement by plaintiff of $350,000 of stock of Ambio with his group in March 1985. This letter purports to *create* the option on June 6, 1985, so as to furnish an explanation for the events five days later on June 11, 1985, when plaintiff received "an American Biomaterials check for approximately $35,000 for my compensation" and "then immediately exercised my right and gave them [Ambio] my personal check for approximately $35,000 to purchase my shares of stock" (T42, 43). The transaction seems to have been handled in this way because plaintiff was collaborating to enable MacKay to concoct the explanation in the February 5, 1986, Prospectus.

After arranging the private placement purchase of Ambio stock in March 1985 by his group for a commission to him of some $105,000 in that stock, plaintiff continued his frequent contacts with MacKay and Russell. He discussed with them the next step, which was the public sale by Ambio of registered stock. Plaintiff was told by MacKay and Russell that they had a "letter of intent to go public from Steinberg & Lerman" (T28); plaintiff told his group that although the private placement stock was "a very high risk," for the company to have "a letter of intent" to go public meant

that the private placement stock "would have great appreciation" (T29–30).

Through Hogland, MacKay was apparently negotiating with "Capital Alaska" for a public issue and felt that he "could do better" with an underwriter other than Steinberg & Lerman (T33–34). Nothing happened with Capital Alaska (T34).

Plaintiff arranged for MacKay to meet with D.H. Blair & Company, and was aware that MacKay was dealing with Greentree Securities as to a public issue (T35). After about two weeks, MacKay told plaintiff that "he had made a deal to take the company public through Greentree Securities" (T38).

It is difficult from the deposition of plaintiff to fix the chronology, but it appears that when MacKay made a deal with Greentree for a public issue of registered shares of Ambio, a conflict of interest developed between plaintiff and his group on the one hand and Ambio on the other. The issue was "the price of the public offering versus the price [at which plaintiff's group] ... purchased their [unregistered] shares" (T61). There is usually a severe discount for unregistered shares (T61, 62). Plaintiff and his group, according to plaintiff, "were led to believe" that the public offering would be "$6 a share" through Steinberg & Lerman and $4 to $5 a share through Capital Alaska, whereas "Greentree's deal was basically at $3 a share to the public" (T62).

Since the price of the public offering of registered shares through Greentree was to be at the *same* price, $3 per share, as the unregistered shares sold at private placement to plaintiff's group (as opposed to the lower $1 per share price of the 35,000 "option" shares sold to plaintiff himself), the "great appreciation" forecast by plaintiff for the shares bought by *his group* was caused to disappear. In his deposition, plaintiff summed up the conflict: "Based on this, I felt it was a raping of the private placement holders and [I] proceeded to fight with the company" (T62–63).

The method of plaintiff's "fight with the company" was to threaten a lawsuit. He and his group "did retain an attorney"

(T63) and he testified (T63): "I believe a lawsuit was filed against Biomaterials ..."; he also believed it was filed, if filed, in New York Supreme Court (T64). This belief is probably mistaken; no evidence has been seen to support plaintiff's belief. My understanding is that to commence a civil action in the New York courts—as opposed to federal courts—it is not necessary that a *complaint* be *filed* with a court; it is sufficient if a *summons* be *served* on a defendant (N.Y.Civ.Prac.L. & R. 203). If plaintiff's object was to frighten Ambio into concessions, an *unfiled* threatened lawsuit might be more effective than a filed, available to the public, complaint. The attorney retained for the civil action was Richard S. Kalin, Esq., through whom plaintiff was introduced to "a legal firm" (T66). Weinstein and his group signed (or initialled) a retainer agreement with Gersten, Savage and Kaplowitz, a law firm, dated November 26, 1985, in which they stated (Joslyn Affidavit, Ex. C): "We as shareholders believe that we were defrauded by Mr. McKay." Weinstein testified that he had "[n]o understanding at all" whether the action was commenced in "federal or state court" (T65), but that the plaintiff "[c]ould well have been me" (T65). Plaintiff stated flatly that he saw "a draft of the complaint" (T66) and said "go ahead with it" (T66). Plaintiff also testified that Mr. Kalin was paid "around $6,500" for the threatened lawsuit and that "all contributed" (T99).

Weinstein personally negotiated with MacKay and Levine (of Greentree) to settle the threatened lawsuit (T65). MacKay said that if plaintiff persisted with his lawsuit Ambio "wouldn't be able to come public" (T65); Levine said that if Ambio could not go public "there would not be funds to run the company and the company [would] then file bankruptcy and go out of business and our moneys and stock would be totally worthless" (T65–66). Weinstein said that "unless there was some sort of consideration" to his group, he and they "didn't care what happened at this point" (T65).

According to plaintiff at his deposition, his was "a hard line" and at one point MacKay "refused to negotiate" with plaintiff, so Kramer, a member of his group (met by plaintiff at Haas; plaintiff has "no idea of his 'profession'" (T67)), took his place, and Kramer and MacKay (with plaintiff "standing behind them" (T67)) reached a settlement under which the threatened lawsuit was dropped.

The settlement reached between plaintiff and his group on the one hand and Ambio on the other is embodied in a letter agreement, dated December 16, 1985, signed on separate signature pages by the members of the Weinstein group and addressed to the Board of Directors of Ambio. The separate signature pages were employed presumably for convenience, to avoid the necessity of all group members signing the same signature pages. A copy of this settlement agreement was transmitted to the Court by counsel for defendant Peat with letter of transmittal dated October 26, 1988.

Under the letter agreement of settlement and general release, the Weinstein group was to receive more favorable terms for its warrants already purchased as part of the March 1985 private placement. As consideration therefor, the group members in the letter gave a general release to Ambio and its officers, directors, etc. of all claims prior to December 16, 1985. Plaintiff Weinstein himself does not appear to have signed the letter with general release, probably because he had *in theory* "paid" only $1 per share for his 35,000 shares, as against $3 per share paid by his group (in fact, plaintiff received the 35,000 shares free—without any price—because Ambio gave him the $35,000 to "pay" for those shares).

5.

The public offering of registered shares and warrants of Ambio was on February 5, 1986, the effective date of the Registration Statement and Prospectus filed with the SEC ("the Statement").

The Statement showed that 5,644,594 shares of Ambio were outstanding prior to the offering.

The offering was in units of two shares of common stock and one warrant (exercis-

able between February 5, 1986, and February 28, 1990) to purchase one-half share of common stock for $1.50 (but "two warrants are required to buy one share, no fractional shares will be issued") (Joslyn Affidavit, Ex. B, p. 7); the price per unit was $6; the shares were thus offered at $3 per share (the same price as the private placement shares in March 1985) less whatever value should be attributed to one-half of the warrant included in the unit offered (a matter of speculation). The Statement showed that a minimum of 700,000 units and a maximum of 1,000,000 were being offered, that 7,044,594 shares would be outstanding after the offering if the minimum number of units offered were sold, and that 7,644,594 shares would be outstanding after the offering if the maximum number of units offered were sold.

According to plaintiff, the Ambio public offering went "very, very successfully initially" (T136).

Neither plaintiff nor any person in his group could be a member of the class for which this action is brought *unless* he or the group person bought shares or warrants or units of Ambio *after* February 5, 1986.

So far as the Weinstein group is concerned, there appears to be no evidence that *any* of them bought *any* shares or warrants or units of Ambio after February 5, 1986 and thus there is no evidence that any of them are members of the class. Weinstein himself testified with respect to this as follows (T47):

Q. Do you know whether any members of this group traded in the publicly traded shares of ABC [Ambio]?

A. Do I know for a fact, no.

Q. Do you have any information whether any of them ever did?

A. No.

As to Weinstein himself, there were purchases and sales after February 5, 1986, and these will be reviewed in this section.

Plaintiff bought shares and warrants of Ambio almost entirely through two accounts at Haas, accounts which apparently he used also for extensive in and out trading in the shares of other companies. The

monthly statements of these accounts "sometimes" ran over twenty pages (T139), and in at least one month to thirty pages (T139); plaintiff was evasive (T139–40) as to the length of his monthly statements (as indicating his volume of trading). In any event, plaintiff testified (T136–37) that he was asked to provide copies of "all" the records of his trading in the "securities" of Ambio and that "to the best" that he could, he had done so; the records produced by plaintiff were marked Exhibits 6 and 7 for identification at his deposition (T137); and plaintiff testified that to the "best" of his "understanding" those exhibits represented "all" of his trading in Ambio securities (T138). The review here is based on those records.

One of the Haas accounts is in the name of David Joel Weinstein and has the number or designation "36–M323" ("323" for short). The other is in the names of David Weinstein and Lynn Weinstein and has the number or designation "36–FK98" ("98" for short). One account was on margin and one was cash (T141); which was which does not appear to have been indicated.

The first purchase by plaintiff in the Haas 323 account was of warrants and was on March 24, 1986. The transactions in this account to the close of business on May 1, 1986, were as follows:

| | | |
|---|---|---|
| 3/24/86 | bought | 1,000 |
| 4/17/86 | bought | 2,000 |
| 4/23/86 | bought | 2,000 |
| 4/25/86 | sold | 200 at a profit |
| 4/28/86 | bought | 1,000 |
| 4/30/86 | bought | 1,200 |
| 5/01/86 | sold | 3,000 at a profit |
| 5/01/86 | sold | 1,000 at a profit |

At the close of business on May 1, 1986, plaintiff had bought 7,200 warrants and had sold 4,200 warrants in the 323 account for a profit. At that point, he held 3,000 warrants in that account.

On the same day that plaintiff was selling 4,000 warrants in his Haas 323 account, May 1, 1986, he bought 6,000 warrants through a new account opened that day at Greentree, a defendant in this action, and the underwriter of the Ambio public offering. An explanation of opening the Green-

tree account on that day to buy Ambio warrants was offered by plaintiff at his deposition: he was "going to purchase some [Ambio] warrants" (T134) and Mr. Levine (of Greentree) "recommended that I purchase the warrants through him and his firm" and Weinstein "agreed" (T134) but to do so had to open an account at Greentree (T134); Levine also told him that "the warrants were the cheapest way of trading the stock" (T135). A more likely explanation for opening the Greentree account would seem to be that plaintiff hesitated to sell 4,000 warrants and buy 6,000 warrants through the same Haas account on the same day. In this connection, it may be noted that at the deposition of plaintiff on March 10, 1988, it was brought out that his sister-in-law had worked at Greentree "sometime in 1986, I believe, possibly 1987" (T165); that he recalled that in his Greentree account there "was one purchase of I think either ... 6,000 or 7,500 warrants" (T166). He was subsequently asked this question (T166):

    Q. Do you recall signing an affidavit in connection with the instant lawsuit?

After colloquy, his answer was (T167):

    A. I don't recollect to be honest, I am sorry.

An affidavit sworn to by plaintiff on February 8, 1988 (just thirty-one days earlier) was then marked Exhibit 8 for identification; plaintiff was shown the affidavit and stated that it had refreshed his recollection. By request, he then read into the record a paragraph of this affidavit, as follows (T167):

    A. I did not trade securities of American [B]iomaterials in my brokerage account with defendant Greentree Securities.

There were then the following questions and answers (T167–68):

    Q. Is that a correct statement?

    A. No, sir.

    Q. Did you realize at the time you were signing the affidavit that you were under oath?

    A. Yes, sir, and at the time I had completely forgotten about the trading at Greentree. There was nothing that I was trying to deceive anyone. I didn't realize until I received your copy and then it all came back to me as how the trade transpired.

Thus, thirty-one days after making a written sworn statement of some significance, plaintiff was obliged to admit that the statement was not true.

On June 11, 1986, plaintiff began trading in Ambio stock through his Haas 323 account by a purchase of 2,000 shares. He promptly sold these at a profit, 1,000 on June 24 and 1,000 on June 25.

On July 1, 1986, plaintiff bought in his Haas 323 account 500 Ambio shares; on July 25 he bought 500 more; and on August 27 he bought 1,000 more—thus on that date he had accumulated 2,000 shares in that account. He then sold 1,500 of these at a loss, 500 on September 4 and 1,000 on September 24, leaving him on that date with 500 shares.

On September 24, 1986, plaintiff sold 1,500 warrants from his Haas 323 account at a loss—his last trade in Ambio warrants in the year 1986 in any account. He held at the end of 1986, in the Haas 323 account, 1,500 warrants.

On November 18, 1986, plaintiff bought 2,000 shares in his Haas 323 account—his last trade in Ambio shares in the year 1986 in any account.

At the end of the year 1986, plaintiff held 2,500 Ambio shares and 1,500 Ambio warrants in his Haas 323 account; in his Greentree account, he held 6,000 Ambio warrants.

In the year 1987, the trading by plaintiff early turned to selling off his already small position in registered shares and warrants of Ambio.

In 1987, plaintiff made *no* purchases of any Ambio shares or warrants through Haas account 323. Through that account, he sold 2,000 Ambio shares: 500 on February 5 at a profit, 1,000 on February 11 at a loss, and 500 on March 11 at a loss. He was left on March 11, 1987, with 500 shares in this account (which he still holds). After March 11, 1987, there were no further Ambio transactions in Haas account 323.

In 1987, all Ambio transactions made by plaintiff, except the three sales just described, were made through a *second* Haas account, the "98" account, to which there has already been reference. Whether this Haas 98 account was newly opened in 1987, or had been in existence before then, does not seem to be shown in the record. It is also not explained in the record *why* plaintiff used a *second* Haas account for nearly all his Ambio trading in 1987. The fact is that all *purchases* by plaintiff of Ambio shares stopped on January 22, 1987, that all his *purchases* of Ambio warrants stopped on February 5, 1987, and that his evident purpose from early 1987 was to liquidate his Ambio position.

In January, 1987, through his Haas 98 account, plaintiff bought 3,000 Ambio shares: 1,000 on January 14, 1,000 on January 22, and a second 1,000 also on January 22. Plaintiff then began to sell Ambio shares and sold 4,500, as follows:

| | | |
|---|---|---|
| 1/27/87 | 1,000 | at a loss |
| 2/09/87 | 1,500 | at a profit |
| 2/10/87 | 1,000 | at a profit as to 500; unknown as to 500 |
| 2/24/87 | 500 | profit or loss unknown |
| 2/27/87 | 500 | profit or loss unknown |

After January 22, 1987, there were no further purchases of Ambio shares in Haas account 98 and after February 27, there were no further sales in this account. It will have been seen that plaintiff sold for this account 4,500 Ambio shares and bought for this account only 3,000 shares. According to plaintiff (T142), he never sold any Ambio shares "short." Assuming this testimony to be true, it can only be concluded that he failed to produce all of his share trading records and that it is impossible to determine, from the records he did produce, what his profit was on his purchases of Ambio shares in the class period, or whether he had a loss and, if so, how much it was.

On February 5, 1987, plaintiff bought 3,000 Ambio warrants in Haas account 98. He then sold these 3,000 warrants, 1,500 on April 7 at a loss and 1,500 on April 8 at a loss, leaving him holding no Ambio warrants in Haas account 98.

The last purchase by plaintiff of Ambio shares or warrants was on February 5, 1987. The last sale by plaintiff of Ambio shares or warrants was on April 8, 1987. Since then he has held, and now holds in total, 500 Ambio registered shares and 7,500 Ambio registered warrants bought in the class period; he holds 35,000 unregistered Ambio shares bought by him *before* the class period. According to plaintiff he has a certificate for the 35,000 shares but where it is located does not appear in the record.

During 1986 and 1987, while plaintiff was buying and selling registered Ambio shares and warrants, and up to at least the suspension of NASDAQ trading on July 13, 1987, plaintiff appears from the record to have been on friendly terms, and in frequent communication, with MacKay and others in Ambio. He obtained a great deal of information about Ambio, and its activities, especially as to matters which might affect the day to day market price of the stock and warrants. As noted before, the testimony of plaintiff, especially as to dates, chronology, and the like, is vague, confused, and uncertain. With difficulty, an attempt has been made to understand and appraise the testimony.

Sometime between fall 1986 and January 1987, MacKay had Ambio pay plaintiff "approximately $6,500 which was in compensation for having my group exercise their warrants and for certain expenses that I had incurred" (T76; also T77). While plaintiff gave a different explanation (T77), it seems more likely that the $6,500 payment to plaintiff by Ambio was to reimburse him for the attorney fee paid out to the lawyer for the threatened lawsuit in December 1985; it also seems to have been an effort (which, as seen, did not succeed) to persuade plaintiff to continue his in and out trading in Ambio and thus help to continue some market for Ambio stock and warrants.

Plaintiff was clear in his testimony that, as long as he was buying and selling Ambio shares and warrants, he kept closely in touch with MacKay for inside information which might affect their prices. He em-

phasized that "if the stock price went down we called asked why it was going down, if the stock price went up we were basically very happy" (T100–01).

Trading by plaintiff in registered shares and warrants of Ambio began on March 24, 1986, and ended on February 5, 1987, as to shares and on April 8, 1987, as to warrants. The pattern of that trading establishes that plaintiff did not buy either the registered shares or warrants as a serious investor for any long or medium term investment. On the contrary, he appears to have been a speculative day to day, in and out trader for short term profits, operating on a "very, very low commission structure" (T17) from a free office supplied to him by Haas, along with a telephone and computer interface.

The testimony of plaintiff himself shows that, because of his short term trading objective, he kept in touch with MacKay as closely as he could to find out what factors were influencing daily Ambio stock and warrant prices. He telephoned MacKay "on an average I'd say of twice a week" (T101); MacKay would pass on information, such as, that they were going to get a contract from "a West German company" or from "a Saudi company" (T102), he "mentioned many different licensing agreements" (T101), and "called me on at least three occasions that U.S. Surgical was taking them over" (T102). This was all "after the public offering" (T103). At the same time, plaintiff did not believe anything MacKay told him and did not rely on anything filed by Ambio with the SEC nor on any information MacKay gave him. He believed that MacKay "fed me with a tremendous amount of false information" (T75), that MacKay gave him "a lot of misinformation" (T100), for example, on the "status of ongoing contracts" (T100), and "was constantly trying to hype the stock" (T100). Some of his group stated that "we knew MacKay was a liar" (T122). Plaintiff himself had earlier testified as to some activity that "it was a pure manipulation" by MacKay (T120).

It is abundantly established on this record that plaintiff believed, before and during the class period, that MacKay, the Chief Executive of Ambio and Russell, his second in command, were without integrity, would falsify reports to the SEC (or any other government agency), and could *not* be relied on in matters affecting Ambio. Plaintiff does not appear to have bought or sold at any time Ambio shares or warrants in reliance on anything MacKay or Russell did, said, or wrote.

Not only did plaintiff, on this record, believe there was deceit, lack of integrity and other character defects in MacKay and Russell so that he placed no reliance in his trading on any of their statements or omissions, but plaintiff at no time called any of these character defects to the attention of the directors or auditors of Ambio. So long as plaintiff himself could profit from short term Ambio trading or at least sell off his position in Ambio against its foreseeable collapse, plaintiff did nothing "to rock the boat."

**6.**

The impetus to the present litigation was provided when a new Comptroller was employed by Ambio effective April 1, 1987. He was Guy Paglinco and his employment was reported in a Registration Statement filed by Ambio with the SEC on June 17, 1987 (p. 41). Paglinco had earlier been employed by defendant Peat as Manager for its audits of Ambio, according to information supplied by counsel in this action for Peat. Apparently Paglinco soon realized that there were questionable activities by MacKay and Russell, the two principal executives of Ambio.

On Monday, July 6, 1987—some months after *all* trading by plaintiff in the shares or warrants of Ambio had stopped—Paglinco resigned his position as Comptroller of Ambio. It seems likely that, a then new Registration Statement being in preparation by Ambio for a new public offering (never made), Paglinco wanted to avoid responsibility for the accuracy of any such Statement (see 15 U.S.C. § 77k(b)).

Mr. Paglinco, at or about the same time, brought to the attention of Peat, the auditors for Ambio, allegations of improper activity by MacKay and Russell. There were

five separate types of activity reported by Paglinco and since they were much later seized on and made the basis by plaintiff for this class action, they should be described. They were: (1) that some $395,-000 was paid by Ambio to Kirkwood Associates (an employment search firm), said to be owned by MacKay and Russell; (2) that Ruppert, an employee of Ambio at $25,000 annually, worked exclusively at the residence of MacKay; (3) that air, travel, and jewelry companies paid "kickbacks" to MacKay and Russell; (4) that an employment agreement with Barcus in July 1986 was to keep him "quiet" as to these transactions; and (5) that travel and entertainment were charged by MacKay and Russell to Ambio but "were of a personal nature" (Peat letter, dated July 10, 1987, Ex. 2 to Form 8–K, filed August 26, 1987; "Peat letter"). It was also reported to Peat by Paglinco that Ambio employees "believe that show dogs personally owned by Mr. MacKay were somehow paid for with Company funds" (Peat letter).

On Wednesday, July 8 and following the report of Paglinco (a former and apparently trusted employee of Peat), Peat met with MacKay and Russell. MacKay admitted that Ruppert "worked exclusively at his [MacKay's] private residence on non-company related business" but denied everything else reported by Paglinco (Peat letter). Peat demanded of MacKay and Russell that an independent investigation be commenced immediately, that it be completed before July 14, that Peat be provided with information, and that Peat be able to speak to Ambio's outside counsel.

On Thursday, July 9, a member of the Ambio outside law firm advised Peat that Kirkwood "was actually Messrs. MacKay and Russell" (Peat letter).

On Friday, July 10, and under that date, Peat delivered a letter to the directors of Ambio. The essence of this letter was that the reports of Paglinco and of outside counsel "raise serious management integrity issues and we believe we can no longer rely on management representations" (Peat letter). Peat made certain demands and gave certain advice. Among these, Peat withdrew its reports as accountants as to financial statements of Ambio, demanded notification by Ambio to those concerned that the Peat accountants reports should not be relied upon, and advised that Ambio consult counsel as to disclosures which should be made to the SEC and other government bodies.

On July 10, at a special meeting of the Board, MacKay and Russell resigned their positions as directors and officers of Ambio. The Board at the same meeting elected Gerald N. Mauder "as its interim Chief Executive Officer and Chairman of the Board" (Press release of Ambio, July 11, 1987, Ex. 3 to Form 8–K, filed August 26, 1987). Mauder had been Vice–President, Sales and Marketing, of Ambio since March 1986.

Also on July 10, a news service apparently called "Reuters" sent out a "financial report," said to have originated at Ambio in New Jersey while its Board was meeting. The report (Weinstein Ex. 3) noted the investigation ordered by the Board and Ambio's request "that trading in its common stock and warrants be halted on the over-the-counter market."

On Saturday, July 11, Ambio issued a press release in New Jersey. This related the events of July 6, 8, and 10, as already described.

On Monday, July 13, another "Reuters" report appeared (Weinstein Ex. 4). This advised of, among other things, the resignations of MacKay and Russell and stated that trading in Ambio "stock on NASDAQ was halted today [July 13]."

Naturally the news of the resignations of MacKay and Russell and the halt in trading of Ambio stock and warrants reached plaintiff very quickly. At his deposition, he testified that this news reached him in mid 1987 (it was in July "over the Dow information service" (T18–19)).

The chronology of events must be interrupted here to note what plaintiff now claims was his then reaction to the news. He testified on March 10, 1988, as follows (T49–50):

Q. Do you recall what information came over the tape?

A. Very similar to what's stated in three [Weinstein Ex. 3]. I don't remember any discussion as to the sales or anything like that, I don't remember mentioning of the attorneys, just that allegations were made against Mr. MacKay and Mr. Russell and that's the trading going to be halted during—for further SEC investigation.

Q. Do you recall that that was about July 10?

A. I don't remember, sir, honestly.

Q. When you first received that information what did you do?

A. I don't remember if I cried or got sick.

Q. Passing by those two reactions.

A. I was in a complete state of shock.

This testimony was at a deposition, not before me, and this Court accepts the principle that the observed demeanor of a witness is an aid in determining credibility. But even so, against the background of established facts, there is serious doubt that this testimony is truthful. Plaintiff had extensive inside knowledge of Ambio affairs; he knew from February 5, 1986, onward that the prospects of Ambio were poor and that the market for its shares and warrants was declining; and he had reason to believe that Ambio was, with MacKay and Russell, in the hands of men (at the least) of doubtful integrity. Plaintiff also had reason to believe that they would not fairly disclose facts as to Ambio and plaintiff himself appears to have assisted them in this, as shown (for example), in the matter of his $35,000 compensation in the private placement, the exchange of checks to cover up his purchase of 35,000 shares, and the dubious "option" letter created by MacKay as a paper justification. Moreover, his trading is evidence that the resignation of MacKay and Russell, and the halt on July 13, 1987, of trading in Ambio shares and warrants was no surprise or "shock" to plaintiff. In 1986, plaintiff bought 6,000 shares and sold 3,500 shares; he bought 13,200 warrants and sold 5,700 warrants. In 1987, plaintiff bought 3,000 shares and sold 6,500 shares; he bought 3,000 warrants and sold 3,000 warrants. After January 22, 1987, plaintiff bought no shares of Ambio but in eight separate transactions sold 6,500 shares. After February 5, 1987, plaintiff bought no warrants of Ambio but in two separate transactions sold 3,000 warrants. The only reasonable conclusion is that from early 1987 plaintiff sold as many Ambio shares and warrants as the market could absorb. Moreover, what plaintiff *did* when he learned the news is revealing as to his then state of mind.

Plaintiff destroyed evidence.

He testified as follows (T18–19; emphasis supplied):

Q. Were you furnished with a copy of the private placement memorandum?

A. Yes, sir.

Q. Do you still have that copy?

A. No, sir, I don't.

Q. What happened to it?

A. Mid 1987, over the Dow information service there came a comment that the Securities and Exchange Commission or NASDAQ, I don't remember which, had halted trading in American Biomaterials, further announcement came out concerning allegations against Mr. MacKay and Mr. Russell, and as I read the nature of these allegations *I basically threw out every piece of paper I had on the company simply in disgust.*

Q. Do you recall what other types of paper you had on the company which you discarded in disgust?

A. I received the initial private placement offering, a secondary issue that Greentree had proposed to do and had not done, a rights offering prospectus from the Hallwood Group, filings, I believe they're called 10Ks from SEC, some correspondence that Mr. MacKay had sent me, other Dow news, service retrieval information, certain sales paraphernalia from the company as to the product line. Basically a whole folder on the company.

Plaintiff later testified (beginning in the middle of an answer; T160–61; emphasis supplied):

It came a time that I recorded a conversation with Mr. Russell on the telephone in which he acknowledged that I was entitled to those shares and Mr. MacKay had acknowledged that I would receive those shares. This was done *without Mr. Russell's knowledge* and I have no idea right now where that tape might be.

MR. JOSLYN: Apropos of that, may I ask you Mr. Mills, to ascertain if you can determine whether that tape is still in existence.

MR. MILLS: You may ask Mr. Weinstein on the record for his best understanding at the moment.

A. It does not exist any longer, sir.

Q. Do you know what happened to it?

A. I believe that went into the *garbage can* with *everything else.*

The "destruction" of "a relevant document" has been said by good authority to be "evidence from which alone its contents may be inferred to be unfavorable to its possessor ..." (2 J. Wigmore, Evidence § 291 (Chadbourn rev.1979)). (It may be noted, as shown just above, that among the documents destroyed by plaintiff was the tape made by plaintiff of a telephone conversation between him and Russell, without the consent or even knowledge of Russell; this is not only "unfavorable" to plaintiff but may be illegal and in any event is unworthy conduct.)

The most reasonable inference from the testimony of plaintiff to his destruction of *all* his relevant documents as soon as he learned of the halt in trading in Ambio is that it was offered in advance to excuse his failure in the future to produce any of those documents.

On July 18, at a Special Meeting of the Ambio directors, Mauder was appointed President, Chief Executive Officer and Chairman of the Board. This seems a further confirmation of the appointment of Mauder made earlier on July 10.

After the July 10 resignations of MacKay and Russell, plaintiff lost all interest in further contacts with them, but did not lose interest in continuing to get money from Ambio for himself or in starting another lawsuit. Plaintiff did not telephone MacKay, but MacKay telephoned plaintiff twice.

Plaintiff is seldom able to give the dates or times of events—only ambiguous speculations. He testified that the first telephone call from MacKay was "well after it came out" (T51) by which I understand him to refer to the July 10 events and the financial reports of them. MacKay told plaintiff that the "allegations ... were untrue," that it was a "power play" to get MacKay out, that he "intended to return," and inquired what plaintiff was "going to do" (T51). Plaintiff replied: "I don't believe you and I was exploring legal action" (T51).

On Friday, July 24, Ambio filed a civil action in New Jersey Superior Court, Somerset County (Docket No. W–1410–87), against MacKay and Russell. There were five counts; the charges included those reported in the Peat July 10 letter already described. The complaint had been verified on July 23, 1987, by Mauder. On July 24, the New Jersey court made an order temporarily restraining "the transfer of personal assets by the defendants [MacKay and Russell]"; this is stated in the 8–K Report by Ambio to the SEC, a copy of which was supplied to the Court by counsel for Peat.

On July 25, the directors of Ambio by resolution "engaged [Touche Ross & Co.] as the independent auditors for the Corporation"; this is in the same 8–K Report to which reference was just made.

On Monday, July 27, Ambio issued a press release from New Jersey announcing the commencement of its civil action against MacKay and Russell.

On August 7, 1987, Mr. Mauder as President and Chief Executive Officer wrote to defendant Peat terminating its engagement as the auditors for Ambio. It was stated that this was believed by the Board to be "appropriate and necessary" in light of "recent allegations and events relating to certain improprieties by the Company's former chief executive and chief financial officers and because of our concerns, in light of the

allegations as to whether appropriate accounting procedures were established...."

### 7.

It is time now to examine how the case at bar was planned, how counsel for plaintiff drafted a complaint using the facts averred *by Ambio* in its New Jersey action commenced July 24, 1987, and how plaintiff (after discussions with his group) determined "who ... was culpable" (T153) and should be made defendants in his action.

It would appear that a fundamental objective of the action planned for plaintiff was to bring it for a large class and to bring it in a federal court in New York City. Such an action would suit the convenience of plaintiff, being in the place where he lived, had worked and where his stock trading had taken place. Such an action would help to minimize the obvious duplication of the Ambio action in New Jersey. Such an action would enable plaintiff to invoke the then developing theory in some federal courts (for example, *Peil v. Speiser*, 806 F.2d 1154, 1160 (3d Cir.1986)) of "fraud on the market," later to be approved by the Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 993, 99 L.Ed.2d 194 (1988). Finally such an action would be based on federal law, creating federal jurisdiction, and involve the large class resulting from the February 5, 1986, public offering, creating the "nuisance value" referred to by the Supreme Court in the *Cohen* case (337 U.S. 541, 548, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949)).

The plaintiff testified, however, that the complaint was filed and the action commenced in order "to recover our loss" (T124), that is, the "loss" of his "group"—those who bought at the private placement in March 1985 and who are *not* members of the class for which this action is in fact brought. This action was commenced, according to plaintiff's testimony, because plaintiff himself had a complete misunderstanding of the composition of the class for which the action is brought.

When the information came over the financial news tapes in July 1987 as to the charges against MacKay and Russell and the halting of trading in Ambio stock,

plaintiff quickly made contact with his group, "everyone I had a relationship with" (T121). He testified (T121):

Q. What was your purpose of contacting them?

A. I think it's self-evident. These people had invested in the company, a fraudulent act had taken place, thought they should be aware of it.

By the time MacKay telephoned plaintiff after the July 10 events, plaintiff, repeating his maneuver in December 1985, was already contemplating a lawsuit; he told MacKay "I am exploring legal action" (T51).

Plaintiff then arranged to meet with Mauder at Ambio in New Jersey. This was "[p]ossibly August or September," 1987 (T150). He had had "numerous phone call conversations" with Mauder (T150). As to the lawsuit plaintiff was contemplating, he testified about his meeting with Mauder (T150–54; emphasis supplied):

Q. Did you ask Mr. Mauder to give you information for use in inclusion in this lawsuit?

A. No, sir.

Q. Did you explain to Mr. Mauder why you wanted a copy of the complaint which the company filed against Mr. MacKay?

A. Basically the reason I asked for a copy of the complaint at that time was that the shareholders who were calling me, *and I represented* had not seen any actions, had not known of actions taken place against Mr. MacKay and were very angry about this, okay, and I explained to Mr. Mauder that I felt that *the group as a whole was going to take some sort of legal action* and that we were very, very angry that no one was going—if these allegations were true that why was there no suit against MacKay, why was no one going after MacKay vis-a-vis the FBI, the Securities and Exchange Commission, the Attorney General's Office and the company as well as some of the participants in the defense here, why they had taken no action against MacKay and why he was out showing his dog in the dog show with our money.

Q. What did Mr. Mauder say?

A. An action had been taken against Mr. MacKay, and he supplied me with a copy of the complaint [in the action commenced on July 24, 1987, by Ambio in New Jersey against MacKay and Russell].

Q. When you told Mr. Mauder that you were planning to bring this lawsuit what did he say?

A. Wasn't the happest guy in the world.

Q. Did he say anything?

A. There's a woman in the room.

Q. Excuse me?

A. There's a woman in the room.

Q. If you want to delete—if you want to insert explanatives deleted at appropriate points that will be fine, just please try to give me the substance.

MR. MILLS: Please give the substance.

Q. Substance, not the color.

A. He wasn't happy, he felt that *if I did proceed with the lawsuit it could hurt the company's chances of coming out of the Chapter 11* [Mauder could not possibly have referred to Ambio being in Chapter 11 because the Chapter 11 petition of Ambio was not filed until December 2, 1987], of finding a financial sugar Daddy to rescue them. He felt that the —in the case of the company that *there was no money in the company anyway* so I wish you luck.

In the case of the board of directors, that at the time that they were helping, whether it's true or not I don't know, infused the company with some fresh capital, and that they were not enemies, to be taken as enemies as I took them, and that he felt it wouldn't be the greatest thing in the world to do.

Q. What did you respond?

A. *Sorry.*

Q. Did you agree to hold up the filing of the lawsuit?

A. No, sir.

Q. Did you discuss with Mr. Mauder who the lawsuit would be brought against?

A. Yes.

Q. Did you discuss it with Mr. Mauder whether he would be included?

A. I chose who *I* felt with conversations with members of my group as to who *we felt was culpable.*

At the time of my involvement with the company I knew Mr. Mauder as nothing more than a salesman and that's how I was introduced to him, that's how he was portrayed to me by Mr. MacKay. I wasn't a thousand percent happy with Mr. Mauder being put in the position he was simply because I felt there was a possibility that he was a right-hand man to MacKay during Mr. MacKay's rein there.

I've come to believe that *Mr. Mauder,* whether it's true or not right now, *has done whatever he physically and possibly can to try and save this company.* I am surprised the company is still in existence right now to be perfectly honest, that the blow that Mr. MacKay struck was a knock-out and *I think it's only by Mr. Mauder's wherewithal that the company is still in existence at this moment.*

*I was never shown* through my meetings with the company, my conversations with Mr. MacKay, through subsequent conversations with Mr. Mauder *any culpability on Mr. Mauder's part in all of this, so I did not proceed against Mr. Mauder.* If you do have information, be my pleasure.

The above is a very lengthy quotation from what plaintiff testified, but it reveals a number of motives and attitudes of plaintiff and his group which are illogical and questionable. In the first place, there is no reason why his group, or why plaintiff himself, should be "angry" about anything. As already noted, there is no evidence that his group bought any Ambio shares or warrants after March, 1985, and as to everything before December 16, 1985, there had been a general release signed by each member of the group of *all* claims in the case at bar. It seems evident that plaintiff himself, as the organizer of that settlement and the threatened lawsuit on which it was based, had given up all such

claims; nothing was signed by plaintiff himself because he had theoretically "paid" only $1 per share for his 35,000 shares (in fact, they were given to him, masked by an exchange of checks). In any event plaintiff had made no investment before February 5, 1986, and could have had no claim to release. Moreover, although the testimony as to his meeting with Mauder was that it took place in August or September 1987 (T150), neither he nor his group had kept up with events sufficiently to know that on July 24, Ambio itself had started a civil action in New Jersey against MacKay and Russell and had obtained a temporary restraining order against them. Moreover, plaintiff had concluded that Mauder, the new and then Chief Executive of Ambio, was honest, reliable, and energetic; in fact, Mauder had *already* commenced an action in New Jersey for Ambio against MacKay and Russell.

Yet, despite Mauder's protests that for plaintiff to commence a duplicate action against MacKay and Russell would hurt Ambio, plaintiff determined to go ahead with such unnecessary and duplicative litigation—the class action presently before this Court—and to name Ambio itself as a defendant, a step bound to aggravate the problem of Mauder to salvage Ambio.

It is possible, of course, that plaintiff felt impelled to commence a duplicate lawsuit by complaints against him by his group. Plaintiff testified (T124–25):

Q. Did any of the members of your group express dissatisfaction with you, annoyance with you?

A. Yes, sir.

Q. Who were they?

A. In small part maybe all of them.

No affidavits nor anything else has been submitted by any member of his group, and the sworn testimony and affidavits of plaintiff create substantial doubt that he is credible.

In any event plaintiff retained counsel and began this class action. He retained Rabin & Sirota, and specifically Howard B. Sirota, Esq., of that firm, although until about June 15, 1988, Edwin J. Mills, Esq., seems to have acted for the firm. On the record I have seen, there appears to be no reason for criticism of Mr. Sirota or others of the firm and none is intended in this opinion; what may appear to be criticism herein is related to plaintiff and (to a lesser extent) to his group.

Plaintiff had met Mr. Sirota at Haas but had never engaged him or his firm (T126). Plaintiff appears, however, to be litigious in stock trading matters—as illustrated by his quick threats of lawsuits in this situation—and an earlier arbitration for his wife with a securities firm over "securities that she was sold and the mishandling of her account" (T127). Mr. Sirota represented the securities firm and plaintiff "was very impressed with the way he carried himself during the arbitration" (T127). Mr. Sirota and his firm have had an earlier experience with a securities class action (*Sirota v. Solitron Devices, Inc.*, 673 F.2d 566 (2d Cir.), cert. denied, 459 U.S. 838, 908, 103 S.Ct. 86, 213, 74 L.Ed.2d 80, 170 (1982)).

Plaintiff testified as to his fee arrangement with Rabin & Sirota (T128–30; emphasis supplied):

Q. Do you have a written agreement with Rabin & Sirota?

A. No, sir. Not to my recollection.

MR. MILLS: The answer is there is no written agreement.

Q. What were your conversations with Rabin & Sirota concerning how they would be compensated?

MR. MILLS: I will object to the question. Are you asking about preretainer conversations?

MR. JOSLYN: I think pre or post.

MR. MILLS: Well, let me hear the question again please.

(Record read.)

MR. JOSLYN: Off the record.

(Discussion held off the record.)

MR. MILLS: Mr. Joslyn, I considered your question. Are you willing to agree to Mr. Weinstein testifying as to his understanding of the fee arrangement with counsel rather than going into the details of discussions with counsel?

MR. JOSLYN: Yes, basically I wanted to find out what his understanding the fee arrangement is.

MR. MILLS: All right, that is fine.

A. When I went to Mr. Sirota to discuss taking action against the company and defendants and Mr. MacKay, any— there was put to me that there would be two possibilities in a way of action, and one was for me to take it on by myself or with this group *or to take it on as a class action.* It was explained to me that if I took it on by myself or with the group that *we would be responsible for paying as we went along,* the expenses to the law firm, whereas if I went into a class action lawsuit, that although I would be responsible for the fees of the legal—of this Rabin & Sirota firm that *the court would award them their fee* based on their time against any *settlement* that might possibly be reached *or award* that was received.

Since the complaint as filed states·that it is a class action, the assumption from the quoted testimony is that plaintiff chose this option after being informed that as a class action the payment of fees and expenses "as we went along" would not be required from plaintiff and his group but would be ordered by the Court "against any settlement that might possibly be reached or award that was received" (T129–30).

Plaintiff explained to his counsel (presumably Mr. Mills) "what the allegations were that were made [presumably in the financial reports and press releases] ... and provided him a copy of a complaint that [Ambio] had filed [in New Jersey] against Mr. MacKay and Mr. Russell" (T149). As plaintiff explained in his testimony (T155), the source of his information as to the "alleged misfeasance of Mr. MacKay or Mr. Russell" was: "... I have only had use of a copy of the complaint that the company [Ambio] filed against them [MacKay and Russell] to use."

Plaintiff testified that, before his class action complaint was filed in this Court, his counsel submitted drafts, *he reviewed those drafts,* he made comments to counsel, and he did not disagree with anything in the complaint. His testimony was as follows (T156):

Q. Did your counsel provide you with drafts of the complaint in this action prior to its filing?

A. Yes, sir.

Q. Did you review those drafts?

A. Yes, sir.

Q. Did you make comments on them?

A. Yes, sir.

Q. Did you send those drafts back to your counsel?

A. Yes, sir.

Q. Did they accept as far as you know all the comments you made?

A. No, sir.

Q. But you don't disagree I take it with anything that's in the complaint?

A. No, sir. I just felt it should be somewhat stronger.

Considering that plaintiff has repeatedly insisted that this action is to recover the "losses" of his group who bought private placement Ambio shares in March 1985, it is puzzling that he approved of, and agreed in advance to the filing of, a complaint on behalf of a class which does *not* include the group "represented" by him.

Nonetheless, plaintiff went his way, insisting in his testimony that his action was to recover the losses of his group. The complaint was filed November 12, 1987. The plaintiff testified on March 10, 1988 (T124):

Q. Did you ever discuss with them what steps you could take to recover your moneys?

A. Basically about a month-and-a-half all the allegations came out, and after I had a conversation with the company at this time and I sort of felt that the dust was sort of clearing as to at least knowing what path we should travel, I felt that the responsibility lied in a number of places and I wished to institute a lawsuit in an attempt to recover our loss.

Q. And that's what you communicated to members of your group?

A. Yes, sir.

Q. Did they agree with that?

A. Yes, sir.

Q. Is there anything else you indicated to members of your group that you thought you could do to recoup losses other than instituting a lawsuit?

A. No, sir.

Q. Is that this lawsuit?

A. Yes, sir.

Plaintiff then reported to his group that he had brought the lawsuit for them. It is hard to accept that he really believed his report to his group, but such was his testimony (T130):

Q. Did you tell members of your group that you have brought this lawsuit to help recoup their losses?

A. Yes.

The filing of the complaint to commence the case at bar was on November 12, 1987.

On December 2, 1987, a petition was filed by Ambio in the United States Bankruptcy Court for the District of New Jersey in Trenton under Chapter 11 of the Bankruptcy Act (Case Docket Number 87–07316).

Under date of December 15, 1987, a letter was addressed and sent to the Clerk of this Court by Gross & Novak, Esqs., of East Brunswick, New Jersey (who stated therein that they represented Ambio), notifying this Court of the filing of the Chapter 11 petition and stating that "the above matter has been stayed" pursuant to Section 362 of the "Bankruptcy Code." The "above matter" was the case at bar.

This Court was advised by counsel for plaintiff that the effect of the Chapter 11 proceeding is to stay the action at bar as against Ambio (Plaintiff's Memorandum of Law in Support of Motion for Class Action Certification, pp. 4, 8; filed January 13, 1988).

By application filed by Ambio in the federal District Court at Trenton, New Jersey, on February 11, 1988, the action by Ambio in the New Jersey Superior Court was removed from that Court to the federal District Court at Trenton. This removal appears to be authorized by 28 U.S.C. §§ 1334(b) and 1452. The application by Ambio for removal of its action against MacKay and Russell from the New Jersey Superior Court was verified by Mr. Mauder

as President of Ambio. The application recited that as of February 11, 1988, no trustee had been appointed, that Ambio (as "Debtor-in-Possession") was "still operating its business," that as a result of the misconduct of MacKay and Russell, Ambio "was forced to file a Chapter 11 proceeding in order to protect the estate," that "[u]ltimate recovery against these defendants [MacKay and Russell] will be an asset of the estate which will be utilized in a plan of reorganization," and that "[t]he causes of action [in the removed action] are property of the estate of the Debtor [Ambio]."

By order signed February 18, 1988, and filed February 19, 1988, Judge Fisher of the federal District Court at Trenton took note of the removal by Ambio of its action from the New Jersey Superior Court "in accordance with the removal provisions of Title 28, § 1441" [so in the original]. Judge Fisher, by the same order, referred the Ambio action "to the United States Bankruptcy Court." On December 13, 14, 16, and 19, 1988, I am advised that Mr. Raymond J. Farrell of Gross & Novak, in response to telephone calls from my law clerk, advised (among other things) that the Ambio action was now proceeding in the Bankruptcy Court at Trenton.

It will doubtless come as a surprise to counsel for the parties to the class action at bar to learn that the Ambio action in the New Jersey Superior Court has, since February 11, 1988, been pending in the Bankruptcy Court at Trenton. The Court learned of the removal only as a result of its own inquiries in this month of December, 1988.

8.

The principles to be applied in making the determination required by Fed.R.Civ.P. 23(c)(1) may be seen from three decisions.

In *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), the Supreme Court, almost forty years ago, considered the application of certain state laws to a stockholders derivative action brought in a federal court on diversity jurisdiction. That problem does not concern us here, but in deciding that problem the Supreme Court spoke, through

Justice Jackson, about class representatives in words which have been often quoted and followed in class actions and which are now instructive here. The Supreme Court said:

> Suits sometimes were brought not to redress real wrongs, but to realize upon their nuisance value. They were bought off by secret settlements in which any wrongs to the general body of share owners were compounded by the suing stockholder, who was mollified by payments from corporate assets. These litigations were aptly characterized in professional slang as "strike suits." And it was said that these suits were more commonly brought by small and irresponsible than by large stockholders, because the former put less to risk and a small interest was more often within the capacity and readiness of management to compromise than a large one. [337 U.S. at 548, 69 S.Ct. at 1226–27].

\*   \*   \*   \*   \*   \*

> [A] stockholder who brings suit on a cause of action derived from the corporation assumes a position, not technically as a trustee perhaps, but one of a fiduciary character. He sues, not for himself alone, but as representative of a class comprising all who are similarly situated. The interests of all in the redress of the wrongs are taken into his hands, *dependent upon his diligence, wisdom and integrity.* And while the stockholders have chosen the corporate director or manager, they have no such election as to a plaintiff who steps forward to represent them. He is a self-chosen representative and a volunteer champion. [337 U.S. at 549, 69 S.Ct. at 1227; emphasis supplied].

\*   \*   \*   \*   \*   \*

> It is not without significance that this Court has found it necessary long ago in the Equity Rules and now in the Federal Rules of Civil Procedure to impose procedural regulations of the class action not applicable to any other. [337 U.S. at 550, 69 S.Ct. at 1227].

*Kline v. Wolf,* 702 F.2d 400 (2d Cir.1983), was a Second Circuit decision and opinion in a class action. Judge Weinfeld had dealt with several different issues in this Court and these were before our Court of Appeals. The only issue here relevant is the class certification issue. Judge Weinfeld had denied two motions for class certification in separate but consolidated actions (88 F.R.D. 696 (S.D.N.Y.1981)). As to plaintiff Block, Judge Weinfeld said:

> Whatever the merits of these contentions, Block's deposition testimony subjects him to a severe attack upon his credibility particularly insofar as his claim is predicated upon reliance on defendants' 1978 financial report or on the market's integrity. The testimony adduced gives strong support to the defendants' position that he was a speculative trader in the Allied stock and that his purchases and sales did not depend upon either the financial statement or the market's reaction thereto. Thus Block would be subject to "unique defenses" on the issue of reliance inapplicable to other purported class members which vitiates the typicality of his claim. [88 F.R.D. at 699].

As to plaintiff Kline, Judge Weinfeld said:

> A class or derivative action representative serves as a fiduciary to advance and protect the interests of those whom he purports to represent; their interests are entrusted to the fiduciary's diligence and industry and the successful protection of the class claims depends upon his integrity. Fay M. Kline's claim of reliance upon the 1978 Annual Report through her husband is disputed by their own broker, which at once raises an unnecessary and vulnerable issue of their credibility to which the ultimate interest of the purported class should not be subjected. In this instance too, the Court does not undertake to resolve the issue of credibility but notes its existence and its potential adverse impact upon the class interest. This cannot be ignored. [88 F.R.D. at 700].

Our Court of Appeals affirmed the denial of the two motions for class certification. The Court, among other things, stated (702 F.2d at 402–03):

Appellants contend that Judge Weinfeld erred in denying both their initial motion for class certification and their renewed motion after the court's decision to "accept" the defendants' settlement offer. They argue first that there was insufficient evidence to find that the plaintiffs' credibility was seriously in doubt. Although a court must be wary of a defendant's efforts to defeat representation of a class on grounds of inadequacy when the effect may be to eliminate any class representation, ... Judge Weinfeld's findings were fully supported by evidence and his denial of representation was proper. Plaintiff Block testified that he had relied upon a report which he now admits did not exist at the time he allegedly relied upon it. Even if this testimony was the product of an innocent mistake, it subjects Block's credibility to serious question. Likewise, while the dispute between William Kline and his broker does not prove that Kline testified falsely, it does cast a shadow over Fay Kline's case. In conjunction with Mrs. Kline's refusal to answer proper discovery questions, there was an adequate basis for the district court to conclude that her representation of the class would be less than adequate. [citations omitted].

Plaintiffs next argue that the district court never *resolved* the issue of credibility, but simply made a preliminary determination that their credibility was vulnerable to attack. Nothing less than a finding that the plaintiffs testified falsely, they imply, could justify a conclusion that they would not be adequate class representatives. At this preliminary stage, however, the court cannot be expected to make a final determination before trial. A preliminary finding is sufficient. [emphasis in original].

The third decision is by Judge Sprizzo in *Darvin v. International Harvester Co.*, 610 F.Supp. 255 (S.D.N.Y.1985). This was a class action in which plaintiff "moved to have the action certified as a class action and to be named class representative pursuant to Fed.R.Civ.P. 23" (610 F.Supp. at 256). The motion was denied, for reasons

strikingly applicable to the case at bar. Judge Sprizzo explained (610 F.Supp. at 256–57):

> The Court finds that plaintiff would not be a suitable class representative and would not adequately protect the interests of the class because, *inter alia,* there are unique defenses which defendants can assert against him, especially with respect to his credibility, and because plaintiff has demonstrated a serious lack of familiarity with the suit.
>
> \*      \*      \*      \*      \*      \*
>
> This type of inconsistent testimony could create serious problems with respect to plaintiff's credibility and could become the focus of cross examination and unique defenses at trial, to the detriment of the class. These credibility problems are a basis for denying plaintiff's motion to be named class representative. [citations omitted].
>
> Moreover, plaintiff repeatedly stated that his memory regarding the complaint and his dealings in Harvester stock were poor.... His deposition demonstrates that his personal knowledge of many of the facts pleaded in the complaint is extremely limited or nonexistent.... Plaintiff was also unsure of who he purported to represent should the suit be certified as a class action.... This uncertainty and inconsistency, which are characteristic of plaintiff's deposition testimony and which indicate plaintiff's unfamiliarity with the action, illustrate his inadequacy to act as class representative. [citations omitted].

### 9.

The background facts, the history of this litigation, the deposition testimony of plaintiff, the documents submitted for the parties, the precedents applicable, and the arguments of counsel have been considered. It has also been noted that there is no "death knell" factor which might have been taken into account in some circuits to some extent before *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), settled the point. There is pending an action by Ambio in the Bank-

ruptcy Court for the District of New Jersey for substantially the same relief as asked in Weinstein's class action, the case at bar. The action is being prosecuted by Mr. Mauder, President of Ambio, whose honesty and integrity were testified to by plaintiff at his deposition: Mauder was not named as a defendant because plaintiff had never seen, in all his dealings with Ambio, "any culpability on Mr. Mauder's part in all of this" (T154), that in fact from plaintiff's knowledge of him plaintiff had "come to believe that Mr. Mauder . . . has done whatever he physically and possibly can to try and save this company [Ambio]" (T154), and that "it's only by Mr. Mauder's wherewithal that the company [Ambio] is still in existence at this moment [March 10, 1988]" (T154).

The conclusion is that the motion for class certification must be denied. In summary, the principal reasons for this conclusion follow.

First, while it is difficult to find as a positive fact that plaintiff has testified falsely or that he is not credible, I do find that his credibility is subject to serious question and to serious doubt. This is required by the several incidents recounted in this opinion. Our Court of Appeals has held that it is "sufficient" for denial of a class certification motion that there be a "preliminary finding" that movant's "credibility was vulnerable to attack" (*Kline v. Wolf,* 702 F.2d at 403). This finding is here made.

Second, the action was brought by plaintiff, according to his testimony, to recoup the losses of his group, who bought Ambio stock and warrants in March 1985 and are *not* shown to be members of the class for which the action is brought. Drafts of the complaint were given to plaintiff, who reviewed them; he did not disagree with anything in the complaint (T156). Plaintiff told the members of his group that he "brought this lawsuit to help recoup *their* losses" (T130; emphasis supplied), a completely inaccurate statement. If plaintiff cannot recognize from the complaint that the class does *not* include the March 1985 private placement purchasers, then he lacks sufficient understanding to be an adequate class representative here.

Third, the education and business experience of plaintiff are not such as to equip him adequately to represent the class in this action. His limited financial experience was in speculative, day to day, in and out, stock trading for short term profits, as opposed to serious investment objectives. This is likely to expose plaintiff to defenses unique to him, where reliance on the allegedly misleading or omitted disclosures may be a significant issue.

Fourth, the many contacts of plaintiff and his group with Ambio, MacKay, and Russell, the purchase of private placement stock by his group before the class period, the gift to plaintiff by MacKay of 35,000 shares of Ambio as compensation before the class period, the general release executed by his group after threats by plaintiff of a lawsuit, the belief in 1985 of plaintiff and his group that MacKay had committed fraud, and the participation by plaintiff in deceits and cover-ups by MacKay, all create possible defenses unique against plaintiff as to reliance (whether on the theory of integrity of the market price or not) and other issues.

Fifth, the plaintiff disclaims any personal knowledge of the claims in the complaint; after his many contacts over nearly three years with Ambio, the complaint is entirely on information and belief, none of it attributed to plaintiff himself; the only "facts" claimed to show liability are copied from the complaint of Ambio in its New Jersey action, which plaintiff testified was the only source of his information as to the "alleged misfeasance" of MacKay and Russell (T155). He claimed to have made only a superficial investigation of Ambio and its prospects. With a disclaimer of any personal knowledge of the claims made in the complaint, plaintiff is not an adequate class representative.

Sixth, there appears to be a possible, if not probable, conflict of interest as between plaintiff, the owner and holder of 35,000 shares of Ambio not represented in this class action and plaintiff, the owner and holder of 500 shares of Ambio which

he bought after February 5, 1986, and which are represented in this class action. The obtaining by the class in this action of a judgment *against* Ambio would appear to give the class a creditor position in priority to non-class shareholders.  Yet plaintiff has seventy times as many non-class shares as class shares of Ambio.

The motion for class certification is denied.

SO ORDERED.